10-4258-cv
Matsumura v. Benihana Nat'l Corp.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**Rulings by summary order do not have precedential effect. Citation to summary orders filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 5th day of March, two thousand twelve.

PRESENT:
    JOSÉ A. CABRANES,
    CHESTER J. STRAUB,
    DEBRA ANN LIVINGSTON,
        *Circuit Judges.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MEI PING (BARBARA) MATSUMURA AND CARL MILNER,
AS TRUSTEE OF THE TRUST U/W/O ARTHUR CUTLER,
        *Plaintiffs-Appellants*,
        -v-                                                      No. 10-4258-cv
BENIHANA NATIONAL CORP. AND HARU HOLDING CORP.,
        *Defendants-Appellees.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| **FOR PLAINTIFFS-APPELLANTS:** | ALFRED N. METZ (Herbert I. Deutsch, *on the brief*), Deutsch, Metz & Deutsch, LLP, New York, NY. |
| **FOR DEFENDANTS-APPELLEES:** | ALAN H. FEIN (Adam M. Schachter, Geri E. Fischman, *on the brief*), Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, FL. |

1

Appeal from the October 19, 2010 judgment of the United States District Court for the Southern District of New York (Buchwald, *J.*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the order of the District Court is AFFIRMED in part, VACATED in part, and REMANDED to the District Court for further proceedings.

Plaintiffs-appellants Mei Ping (Barbara) Matsumura ("Matsumura") and Carl Milner ("Milner") (jointly, "Plaintiffs"), minority shareholders in Haru Holding Company ("Haru"), appeal a judgment of the District Court denying partial summary judgment to Plaintiffs, and granting partial summary judgment to defendant-appellee Benihana National Corporation ("BNC"), on Plaintiffs' breach of contract and breach of fiduciary duty claims. Plaintiffs also appeal the District Court's denial of prejudgment interest.

## BACKGROUND

We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues raised on appeal. In brief, Matsumura and Arthur Cutler founded a sushi restaurant chain in New York City under the name "Haru" in 1996. Arthur Cutler died in 1997, leaving Milner as trustee of a trust into which his ownership interest in Haru passed. In 1999, BNC, an international restaurant chain, acquired a controlling interest in Haru, including shares formerly owned by Matsumura. As part of this transaction, Plaintiffs retained a put option to sell their remaining shares to BNC, which Plaintiffs exercised in 2005. The parties' dispute focuses on how the shares tendered pursuant to that put option ought to be valued.

On August 5, 1999, BNC and Matsumura signed a Stock Purchase Agreement (the "SPA"), which contained the terms of BNC's acquisition of a majority interest in Haru. The SPA

2

contemplated that BNC would borrow funds to pay for the acquisition. Section 11.1 of the SPA provided that "[e]xcept as otherwise provided hereto, the parties hereto shall each bear its [sic] own expenses in connection with the transactions contemplated by this Agreement, including the fees of attorneys, accountants, advisors, brokers, investment bankers and other representatives and transfer taxes." The SPA also contained a merger clause.

Section 6.2.5 of the SPA required the execution of a Stockholders' Agreement, a version of which was attached to the SPA but never executed. On November 12, 1999, the parties executed an Amendment to the Stock Purchase Agreement ("ASPA"), to which a revised version of the Stockholders' Agreement ("SHA") was attached. On December 6, 1999, the parties executed the SHA that had been attached to the ASPA. The SHA provided a put option, under which Plaintiffs could exercise their right to require BNC to purchase their remaining 20% interest in Haru for the "Put Price" during the period from July 1, 2005 to September 30, 2005.

The SHA provided a formula for valuing the Plaintiffs' put option:

> *"Put Price"* means (A) Four and One-Half (4 1/2) times (B) the Company's Consolidated Cash Flow for the Pricing Fiscal year, from which total is subtracted (C) the Amount of Company Debt, which total is divided by (D) the number of shares of Common Stock outstanding as at the date of such computation.

Under the formula, an increase in Haru's "Consolidated Cash Flow" caused the value of Plaintiffs' interest to rise (by a multiple of 4.5), while an increase in Haru's "Amount of Company Debt" caused the value of Plaintiffs' interest to fall. This "Put Price" formula replaced an earlier provision in the non-executed draft attached to the SPA that would have valued the Plaintiffs' interest at "Fair Market Value."

3

The SHA provided the following definitions for "Amount of Company Debt" and "Consolidated Cash Flow":

> *"Amount of Company Debt"* means, as of the end of the Pricing Fiscal Year, the total of all indebtedness (including all accrued and unpaid interest) of the Company and its subsidiaries (including, without limitation, indebtedness to stockholders of the Company and, in the case of indebtedness to BNC, all accrued and unpaid interest thereof computed at the rate of interest charged to BNC (or its parent, Benihana Inc.) under their primary bank line of credit (which is, on the date hereof, with First Union National Bank)) other than accounts payable incurred in the ordinary course of business.

> *"Consolidated Cash Flow,"* for any period, means Consolidated Net Operating Income, (A) increased by the sum of (i) the Consolidated Interest Expense for such period, (ii) the Consolidated Income Tax Expense for such period, (iii) the Consolidated Depreciation Expense for such period, (iv) the Consolidated Amortization Expense for such period and (v) other non-cash items which reduced Consolidated Net Operating Income in such period and (B) decreased by the sum of the non-cash items which increased Consolidated Net Operating Income in such period.

The SHA further provided for the components of "Consolidated Cash Flow" to be calculated in accordance with GAAP, which the SHA defined as "generally accepted accounting principles for the restaurant industry as in effect on the date of this Agreement, applied on a consistent basis throughout any given period of measurement." Like the SPA, the SHA contained a merger clause.

The acquisition closed on December 6, 1999, pursuant to the SPA, ASPA, and SHA. BNC paid $8,125,000 for 80% of Haru's stock plus the assignment of certain assets, and Plaintiffs retained a 20% interest in the company. In connection with the transaction, BNC incurred legal and investment banking fees of $393,551.61. At closing, Matsumura entered into an employment contract, pursuant to which she would serve as Haru's Vice President and Chief Operating Officer.

On January 2, 2000, BNC recorded the amount of $8,735,540.14 as "debt" on Haru's books. This amount consisted of $8,125,000 as the purchase price for BNC's stake in Haru, $393,551.61 for BNC's legal and investment banking fees in connection with the acquisition, $214,103.33 as security deposit and monthly rent for Haru's Times Square location, and $2,885.20 in miscellaneous other costs.

Over the next several years, BNC operated Haru and maintained an "intercompany" or "interdepartment" line on Haru's books to indicate the debt owed by Haru to BNC.[1] Matsumura served as Haru's Vice President and Chief Operating Officer from December 6, 1999 until she resigned in 2005. BNC provided Matsumura with regular financial statements that included a line item reflecting debt owed by Haru to BNC. Matsumura, as an officer and director of Haru, also had access to Haru's accounting books and records.

In mid-2005, Plaintiffs timely exercised their put option under the SHA. BNC calculated that approximately $3,718,000 was due to Plaintiffs under the Put Price formula. This value reflects a deduction of approximately $9,115,000 as "Amount of Company Debt," which was the "interdepartment" account balance as of March 27, 2005.

Although BNC placed $3,717,996.20 in escrow, Plaintiffs did not tender their shares, disputing the value of "Amount of Company Debt." Specifically and as relevant here, Plaintiffs contended that the $8,125,000 purchase price and $393,551.61 of expenses BNC incurred in

[1] The "intercompany" or "interdepartment" accounting line item was (1) increased to reflect construction costs fronted by BNC for the construction of new Haru restaurants, (2) increased to reflect the provision to Haru of goods and materials used in the day-to-day operation of its restaurants, including food, supplies, and payroll, and (3) decreased using the cash from Haru's restaurant revenue, which was "upstreamed" to BNC. The District Court found that item (3) effectively offset item (2). *See Matsumura v. Benihana Nat'l Corp.*, No. 06 Civ. 7609 (NRB), 2010 WL 882968, at *3 (S.D.N.Y. Mar. 5, 2010) ("Since the interdepartment line was both credited and debited in connection with Haru's day-to-day operations, items (2) and (3) essentially cancelled each other out over time.").

5

connection with the acquisition should be excluded from the "Amount of Company Debt" calculation, as should any amounts properly categorized as "accounts payable in the ordinary course of business." In light of this dispute, the put option transaction was never consummated.

Plaintiffs filed a complaint in New York state court on August 25, 2006. On September 21, 2006, the action was removed to federal court based on diversity of citizenship, 28 U.S.C. § 1332. Plaintiffs filed an amended complaint on July 10, 2007, alleging numerous claims against multiple defendants, including BNC. On defendants' motions to dismiss under Rule 12(b)(6), the District Court declined to dismiss the breach of fiduciary duty and breach of contract claims against BNC but dismissed all the remaining claims and defendants. *See Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245 (S.D.N.Y. 2008).

After discovery was complete, both parties moved for summary judgment. The District Court granted summary judgment in part and denied summary judgment in part to each party. *See Matsumura v. Benihana Nat'l Corp.*, No. 06 Civ. 7609 (NRB), 2010 WL 882968 (S.D.N.Y. Mar. 5, 2010). Specifically, the District Court granted BNC's motion for summary judgment as to Plaintiffs' breach of contract claim, except as to BNC's inclusion of $393,551.61 of its legal and banking expenses from the acquisition in the "Amount of Company Debt" under the Put Price formula; granted BNC's motion for summary judgment as to Plaintiffs' breach of fiduciary duty claim; directed the parties to recalculate the value of Plaintiffs' put option and complete the put option transaction, which had been held in abeyance pending the resolution of the case; and instructed the Clerk of the Court to close the case. Judgment was entered on March 9, 2010.

On Plaintiffs' motion, the District Court issued an amended order on October 13, 2010 confirming its March 4, 2010 order, determining the Put Price to be $3,796,706.52, and ordering the

parties to close within 30 days from the date of entry of judgment on the order. The amended order also denied Plaintiffs any statutory prejudgment interest. An amended judgment was entered in conformity with the amended order on October 19, 2010.

Plaintiffs timely filed a Notice of Appeal from the final amended judgment. On appeal, Plaintiffs challenge the District Court's grant of summary judgment to BNC on their breach of contract and breach of fiduciary duty claims, as well as the District Court's denial of prejudgment interest.

## I. SUMMARY JUDGMENT

### A. Standard of Review

We review *de novo* an order of a district court granting or denying summary judgment. *See, e.g.*, *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000). Summary judgment is warranted only upon a showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there are genuine issues of material fact, "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quotation marks omitted). However, "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). We review a district court's interpretation of a contract *de novo*. *See, e.g.*, *Capital Ventures Int'l v. Republic of Arg.*, 552 F.3d 289, 293 (2d Cir. 2009).

**B. Discussion**

Following our *de novo* review, we affirm the judgment of the District Court granting partial summary judgment to BNC on Plaintiffs' breach of contract claim (including Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing) insofar as that claim is predicated on the inclusion of the acquisition price of Haru as interdepartmental debt of Haru and also affirm as to the District Court's dismissal of Plaintiff's breach of fiduciary duty claim and its decision not to allow prejudgment interest. However, we vacate the grant of summary judgment on the contract claim insofar as it is predicated on the inclusion of "accounts payable in the ordinary course of business" as interdepartmental debt.

*1. Breach of Contract*

Plaintiffs argue that BNC's use of push-down accounting to include the costs of its acquisition of Haru within Haru's "Amount of Company Debt" constitutes a breach of Section 11.1 of the SPA, which provided that "the parties shall each bear its own [sic] expenses in connection with the transactions contemplated by this Agreement, including the fees of attorneys, accountants, advisors, brokers, investment bankers and other representatives and transfer taxes." The District Court correctly determined (and BNC does not dispute) that BNC's push-down treatment of $393,551.61 in legal and banking fees from the acquisition constituted a breach of contract because Section 11.1 required BNC to "bear its own" legal and banking expenses related to the transaction, and thus prohibited BNC from recording those transactional fees as "debt" on Haru's books.

This reasoning does not apply to the push-down treatment of the purchase price, however, because Section 11.1 is not appropriately read to include the purchase price. Section 11.1 appears at the very end of the SPA, along with various standard "housekeeping" provisions, such as the

8

integration clause and choice of law and choice of forum clauses, which do not address the primary substance of the agreement and which have nothing to do with the purchase price of Haru. If Section 11.1 had been designed to make clear that liability for the purchase price is to remain with the buyer (and consequently cannot be "pushed down" to Haru), one would expect it to appear in Article 1, which addresses the purchase and sale of a majority interest in Haru, not in Article 11, with the other various "housekeeping" provisions.

Plaintiffs also argue that BNC breached the SHA by including the purchase price of Haru in the "Amount of Company Debt" when the purchase price does not fall within the meaning of the term "indebtedness," as used in the SHA. However, the SHA expressly contemplates the inclusion in the "Amount of Company Debt" of "indebtedness to BNC." It also provides an interest rate for the calculation of interest on loans from BNC, thus indicating that such loans are unlikely to be accompanied by the full panoply of legal documentation that typically marks loans between unrelated parties. In light of the language of the SHA, we conclude that the District Court correctly interpreted the term "indebtedness" to include the amount of Haru's purchase price which BNC "pushed down" to Haru.

However, the District Court erred by granting summary judgment to BNC on Plaintiffs' breach of contract claim insofar as the claim is predicated on the inclusion of day-to-day business expenses of Haru (such as expenses for food and payroll) in the "Amount of Company Debt." The SHA explicitly exempts from the definition of "Amount of Company Debt" "accounts payable incurred in the ordinary course of business." The District Court correctly noted that the inclusion of these day-to-day business expenses in the "Amount of Company Debt" "could in theory constitute a breach of contract." Relying on a supposed concession by counsel for Plaintiffs at oral argument,

9

the District Court concluded that, in the circumstances of the case at bar, the amount of debt carried by Haru as a result of these expenses was canceled out by Haru's "upstreaming" of all revenue to BNC. However, a review of the transcript of the proceedings before the District Court reveals that counsel did not make such a concession; rather, he merely acknowledged that day-to-day business expenditures were made by BNC and that day-to-day business proceeds were paid to it, without conceding that these two amounts cancelled each other out. Accordingly, insofar as Plaintiffs' contract claim is based on the inclusion of "accounts payable in the ordinary course of business" in the "Amount of Company Debt," the District Court's grant of summary judgment to BNC was in error, and the District Court's decision and judgment are vacated so that it may be determined, as a factual matter, whether the amount of day-to-day business expenses carried by Haru as interdepartmental debt was indeed canceled out by Haru's "upstreaming" of revenue to BNC.

*2. Breach of Implied Covenants of Good Faith and Fair Dealing*

Plaintiffs argue that "BNC's conduct constitutes a breach of the covenants of good faith and fair dealing implied in all contracts." Am. Compl. ¶ 24. "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Plaintiffs based their breach of good faith claim on the same operative facts as their breach of contract claim; accordingly, the District Court did not err in dismissing the former claim as duplicative of the latter.

10

*3. Breach of Fiduciary Duty*

Haru is incorporated in Delaware. Accordingly, under New York choice of law rules, Delaware law applies to the claim for breach of fiduciary duty. *See Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980).

Plaintiffs allege that BNC breached its fiduciary duty of loyalty to minority shareholders of Haru by pushing down Haru's purchase price, thus benefiting BNC at the expense of Plaintiffs. However, under Delaware law, "[i]t is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010). This principle applies in the context of the implied duty of good faith and fair dealing. *See Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 834 (Del. Ch. 2006); *see also Adkins v. Gen. Motors Corp.*, 170 F. App'x 184, 187 (2d Cir. 2006) (summary order) ("Had [appellant] believed that GM breached the express terms of [the] contract, and/or the implied covenant of good faith and fair dealing underlying the contract, he should have brought a breach of contract claim.").

Here, Plaintiffs allege that BNC breached its implied duty of good faith and fair dealing by pushing down Haru's purchase price to Haru's books. This claim is precisely the same as Plaintiffs' fiduciary duty claim. Accordingly, the fiduciary duty claim is superfluous under Delaware law, and the District Court's dismissal of this claim was appropriate. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("[A]n appellate court may affirm the judgment of the district court on any ground fairly supported by the record.").

11

## II. PREJUDGMENT INTEREST

Although interest awards are generally "within the discretion of the district court and will not be overturned on appeal absent an abuse of that discretion," New York law requires a district court to grant prejudgment interest when a party is entitled to such interest as a matter of right. *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 602–03 (2d Cir. 2003). A prevailing party is entitled to prejudgment interest as a matter of right "upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." N.Y. C.P.L.R. § 5001(a) (McKinney 2007). Section 5001 "permits a creditor to recover prejudgment interest on unpaid interest and principal payments awarded *from the date each payment became due under the terms of the promissory note* to the date liability is established." *Spodek v. Park Prop. Dev. Assocs.*, 96 N.Y. 2d 577, 581 (2001) (emphasis added).

In this case, Plaintiffs are not entitled to prejudgment interest because the Put Price did not become due until closing. Section 3.3 of the SHA provides that "the Put Price shall be paid by BNC in cash on closing," a date "which is not more than 15 days after the Put Price is determined." The SHA does not specify which party shall "determine[]" the Put Price; accordingly, the best reading of this clause is that it requires mutual determination–that is, it requires agreement between the parties to the SHA as to the amount of the Put Price before the obligation to close is triggered. After Plaintiffs exercised the put option, BNC calculated that approximately $3.7 million was due to Plaintiffs for their shares in Haru, informed Plaintiffs that it was prepared to close, and placed the money for Plaintiffs' shares in escrow. Plaintiffs declined to accept the approximately $3.7 million, choosing instead to litigate the value of the stock they intended to sell pursuant to the put option.

As a result, Plaintiffs did not tender their remaining shares for cash. The District Court resolved the value of the put option in its October 13, 2010 order, and the clerk entered judgment six days later on October 19, 2010. The closing was to occur on a date following the entry of final judgment, so plaintiffs are not entitled to prejudgment interest.

## CONCLUSION

We have considered all other arguments raised by Plaintiffs and have found them to be meritless. For the reasons stated above, the judgment of the District Court entered October 19, 2010, is VACATED with respect to the partial grant of summary judgment to BNC on the claim for breach of contract insofar as that claim is predicated on BNC's inclusion of "accounts payable in the ordinary course of business" in the "Amount of Company Debt." The judgment is AFFIRMED with respect to all other issues and REMANDED for further proceedings not inconsistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

13